IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In Re<br>RICHARD SHAW,<br>                        Debtor. | Chapter 7<br>Case No. 05-11237-PHX-SSC |
| BRYAN and SALINA TURNER,<br>                        Debtor. | Chapter 13<br>Case No. 05-1779-PHX-SSC |

MEMORANDUM DECISION

(Opinion to Post)

## **I. Preliminary Statement**

Although these matters were tried separately, the Court has incorporated the facts and law for each matter in this Memorandum.[1] This Decision results from an Order to Show Cause that the Court issued as to the law firm representing the Debtors in each of these cases. After appropriate notice to the law firm, evidentiary hearings were conducted on the Order to Show Cause in the Turner case and a hearing at which only the attorneys from the law firm attended

---

**1.** Each Decision will be electronically filed in each case, with the debtor and the firm to decide how to proceed independently in each case.

1

was conducted in the Shaw case.

In this Memorandum Decision, the Court has now set forth its findings of fact and conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure. The issues addressed herein constitute a core proceeding over which this Court has jurisdiction. 28 U.S.C. §§ 1334(b) and 157(b) (West 2006).

## II. Factual Discussion

### A. The Turner Case

On February 8, 2005, Bryan T. Turner and Salina Reed-Turner filed their Chapter 13 petition. The Debtors owned a residence at 2241 E. Augusta Avenue, in Chandler, Arizona. However, the Debtors found it increasingly more difficult to make mortgage payments on the residence because of financial difficulties. Mr. Turner contacted a law firm and scheduled an initial consultation with it.[2] Around August 12, 2004, they met with an attorney at the law firm of Phillips & Associates ("Firm") to assist them.[3] After the initial consultation and the Debtors' then agreement to retain the Firm, they received a letter dated August 16, 2004, from Ms. Colleen Engineer, an attorney with the Firm.[4] This letter stated the procedure for the payment of attorneys' fees on a schedule, if the Debtors had selected that option, and noted that the Debtors would be receiving a letter soon from the attorney and legal assistant who were assigned to their case.[5]

The Debtors executed a fee agreement ("Fee Agreement") with the Firm on August 24,

---

**2.** Exhibit 10.

**3.** The attorney who met with them at that first meeting eventually left the firm.

**4.** Exhibit 11.

**5.** Id.

2

2004.[6] The legal fees to paid by the Debtors are set forth in Paragraph 5.[7] The Debtors agreed to pay a "minimum amount of $2,000," with the Firm to accept "the remaining $750" as payments under the Chapter 13 Plan.[8] The scope of the services to be performed for said fee included, <u>inter alia,</u> representation of the Debtors at the 341 meeting of creditors, "personal property lien avoidance proceedings," and uncontested redemption hearings, and providing advice as to reaffirmation agreements.[9] Apparently the Fee Agreement also contained a notice that Robert Teague would be their attorney.[10]

At approximately the same time as the execution of the Fee Agreement, the Debtors received four separate letters from the Firm, all dated August 23, 2004. The first letter advised the Debtors who would be the supervising attorney and which attorneys would be working on their case.[11] Tellingly all of the attorneys named in the letter had not met with the Debtors. Although the letter addresses what might happen if the Debtors purchased a home, it does not provide any information about the Debtors' sale of their residence.[12] The second letter provides more information from the supervising attorney about the Chapter 13 process, focusing on wage payments and any payments proposed by the Debtors to be made under a retirement plan.[13] The third letter also provides more information about the Chapter 13 process, including "pointers" on

---

**6.** Exhibit 4.

**7.** <u>Id.</u> at p.3.

**8.** <u>Id.</u> at p. 3, ¶5.

**9.** <u>Id.</u> at p.1, ¶1.

**10.** <u>Id.</u>

**11.** Exhibit 6.

**12.** <u>Id.</u> at p. 2, ¶3.

**13.** Exhibit 7.

3

how to make the Debtors' case successful."[14] The letter advises the Debtors to resume making regular mortgage payments on their residence, whether they were current pre-petition or not, and that the Debtors should keep track of any continuances of a trustee sale of their residence, if their residence was in the process of being foreclosed when they filed their petition.[15] The fourth letter is an introductory letter from the legal assistant who will be working with the aforesaid attorneys.[16] This letter requested that the Debtors complete the questionnaire that was given to them when they met with their attorney at the initial consultation, make an appointment for a "financial interview," and schedule a time to execute their "final paperwork."[17]

Although prior correspondence from the Firm had stated that Mr. Nemeth would be the supervising attorney on their case, a letter dated August 30, 2004, from the Firm, executed by Mr. Robert Arentz as the "Supervising Attorney," thanked the Debtors for choosing the Firm and invited them to visit the Firm's website.[18] The letter notes at the bottom that there is an enclosure; however, the letter does not state what it is.

The Debtors did utilize the Firm to file their bankruptcy petition on February 8, 2005. It appears that it took the Debtors some time to acquire the funds necessary to pay the Firm to commence their case. At trial, Mr. Turner testified that he and his wife filed Chapter 13 to save their residence and car and to pay their creditors in full over time. The Debtors had no real contact with any attorneys after the initial meeting in August 2004, even after they filed their case.[19] They usually were referred to a legal assistant when they had questions.

---

**14.** Exhibit 8.

**15.** Id. p. 3, ¶s 2 and 3 under the Important Pointers Paragraph.

**16.** Exhibit 9.

**17.** Id.

**18.** Exhibit 12.

**19.** The Fee Application and Amended Fee Application filed by the Firm on November 2 and November 8, 2005, Docket Entry Nos. 51 and 53, reflect that no one from the Firm

4

In May 2005, the attorney that they had initially met with sent a letter advising the Debtors that they were in default in their post-petition mortgage payments and that a motion for relief from stay had been filed by the secured creditor.[20] The letter had a box checked that stated that the Debtors had failed to make payments as of March 2005.[21] There is no indication that the Debtors were directly contacted, but the Firm did file a response to the Motion.[22] No evidence was presented that when the attorney that had been representing them left the Firm in June 2005, the Debtors were promptly notified of that fact.

The Debtors continued to struggle in the Chapter 13; they could not afford to make the mortgage payments on their residence. Ms. Reed-Turner had been ill, off and on, which affected the income that the Debtors were receiving. The Debtors listed their residence for sale, with the assistance of Mr. Raskin, a real estate agent. It appears that when the Debtors so advised the Firm, they were requested to make an appointment with Mr. Schollian, the attorney who would be handling their case. Mr. Schollian testified that he had been assigned by the Firm to the Debtors' case in June 2005. He stated that the Debtors had fallen behind in plan payments and in post-petition mortgage payments. However, the Firm's time records reflect that Mr. Schollian did not meet with the Debtors as to a sale of their residence until July 5, 2005.[23] Mr. Schollian testified that he entered into a stipulation with the Debtors' mortgage lender to cure the post-petition arrearages as to their residence. According to the electronic docket, a stipulation was entered into by the parties on July 18, 2005.[24]

---

contacted the Debtors from August 2004 until February 2005, when the Debtors case was filed.

**20.** Exhibit 18.

**21.** Id.

**22.** Exhibit 17.

**23.** See Fee Application and Amended Fee Application at p.4, which includes detailed time entries.

**24.** Docket Entry No. 28.

5

1    After the July 2005 consultation with Mr. Schollian, the Debtors attempted to sell their
2 home and retained the assistance of Mr. Raskin as their real estate agent. By the end of July
3 2005, the Debtors had obtained a contract on the sale of their residence for the price of $370,000.
4 They provided this information to the Firm around the first of August 2005. Although Mr.
5 Turner expressed some frustration as to the Firm's delay concerning when the motion to sell the
6 Debtors' residence was first presented to the Court, the record reflects that the Firm filed the
7 Motion to Sell on August 3, 2005, which provided that certain liens of record and closing costs
8 be paid at the close of escrow.[25] The hearing on the Sale Motion was scheduled for August 16,
9 with a closing of escrow to occur around August 19, 2005.[26] One of the lienholders filed a
10 limited objection to the sale, noting that they needed more information about the sale and how
11 the lieholder would be paid.[27]

12    At the August 16, 2005 hearing, Ms. Froes, on behalf of the Debtors, and counsel for the
13 first and second mortgage lender appeared. Ms. Froes advised the Court that the "sale had fallen
14 through." At that time, it appeared that another party was willing to bid $300,000 for the home.
15 The Court was reluctant to proceed with an auction of the residence without further notice and
16 hearing, particularly in light of the fact that the bid was substantially lower than the contract
17 which had been noticed out to creditors and interested parties. In turn, Ms. Froes requested that
18 the Court provide a second call of the matter, so that she could contact her client to determine
19 whether a hearing should proceed on the bid and when. During the course of the hearing, Ms.
20 Froes was also provided with information that a trustee's sale of the Debtor's residence could
21 occur as early as August 25, 2005, so there was some urgency in Ms. Froes contacting her client
22 and determining what would be the next step.

23    Both Ms. Froes and Mr. Turner testified as to the telephone conversation which occurred

---

**25.** Docket Entry No. 30.

**26.** Docket Entry Nos. 33 and 34.

**27.** The Objection is Docket Entry No.36.

6

between them on August 16 before the second call of the case.  Ms. Froes was trying to advise the Debtors of the bid that had been made and determine how they wanted to proceed with a trustee's sale approaching.  Ms. Froes conceded that she was at a disadvantage, since she had recently been assigned the Debtors' file.[28]  Although she testified that she had reviewed the file prior to the hearing, it is clear to this Court that she did not have a clear understanding of basic points in the Debtors' case, such as whether any of the consensual lienholders had filed motions for relief from the automatic stay and whether a trustee's sale of the Debtors' residence was about to take place.  In turn, Mr. Turner testified that he received a call from an attorney that he had never heard of and had never met.  Moreover, she was advising him that there was a bid or offer for his property, but it was substantially lower than the contact that had been obtained.  The last straw was that she was advising him that he should do something promptly, since there was a trustee's sale of the Debtors' residence.  Mr. Turner was not aware of any such trustee's sale, and he believed that he had some time to sell his property at a more leisurely pace.  Ms. Froes was looking for direction, and Mr. Turner was extremely upset at the situation.  The Court concludes that the Debtors should have been provided with the correct factual information by an attorney that they had met and consulted.  Although Ms. Froes did the best that she could in a difficult situation, the Firm should not have placed her in that situation.

Ms. Froes returned to the Courtroom and requested that an auction be scheduled on the lower bid, since it seemed that the Debtors were about to lose their residence at a trustee's sale. The Court scheduled an expedited hearing for the auction for August 24, 2005.

Matters only went downhill.  The Debtors and their real estate agent now believed that they had to try to market and sell the Debtors' residence over the next few days for more than $300,000, or they would have to accept the lower offer at the August 24 hearing or lose the residence at the trustee's sale.  By August 21, 2005, the Debtors and Mr. Raskin had obtained a

---

**28.** Because of the departure of Ms. Joy and Ms. Froes recently having been hired by the Firm, Ms. Froes testified that she was assigned in early August 2005 in excess of 500 files.

7

new contract on the residence which provided for a prompt close of escrow. This contract offer was increased to $320,000 by the time of the August 24 hearing. At the August 24, 2005 hearing, the Debtors, Mr. Raskin, counsel for the first and second lienholder, and counsel for the proposed bidder all appeared. Counsel for the Debtors did not. The Debtors were left in a very difficult situation without the representation of counsel. The Court proceeded with the sale hearing, with the highest and best offer determined in the amount of $320,000, and a backup offer in the amount of $300,000. Counsel for the first and second lienholder stated that the trustee's sale was not going to occur right away because there "was a noticing issue." Because Debtors' counsel was not present, the Court requested that counsel for one of the bidders prepare the sale order, and set up procedures for an initial closing on August 31, 2005, and the closing of the backup offer no later than September 12, 2005. The Court also set an order to show cause hearing for the failure of Debtors' counsel to appear for September 6, 2005. This Order to Show cause was sent to Mr. Nemeth and Ms. Froes and directed that "counsel for the Debtor" shall appear at the hearing.[29]

At the trial on the Order to Show Cause, Ms. Froes and Mr. Turner testified that they had a conversation after the August 16 hearing. Ms. Froes was in her office when she took the call, and she asked her legal assistant to step in and also listen. Ms. Froes testified that Mr. Turner was still angry at her as a result of what had transpired at the August 16 Court hearing and was abusive in the telephone conversation. Mr. Turner agreed that he was angry, but he testified that anyone would be angry in his situation. He stated that he was never abusive. Ms. Froes determined that Mr. Turner was engaging in sexual harassment or had a gender bias issue and that she could no longer represent the Debtors. She decided to return the file to Mr. Schollian. There is nothing in the file to reflect that the Debtors were alerted as to the gender bias issue.[30]

---

**29.** *See* Minute Entry Order dated August 24, 2005, Docket Entry No.42.

**30.** At one of the hearings before this Court, Mr. Schollian stated that it did not make sense to notify the client of a gender bias issue. This Court disagrees. How is a gender bias

8

Of course, the Court was not advised that the file had been transferred to Mr. Schollian, so when the Debtors were not represented by counsel at the August 24 hearing, the Court sent the Order to Show Cause to those attorneys that appeared to be recently of record.

Mr. Schollian, after being advised of what transpired at the August 24 hearing, contacted the Debtors and apologized for his failure to appear. He also contacted this judge's chambers to state that he would promptly file a document as to why he did not appear. He never filed such a document with this Court, but did testify at the Order to Show Cause hearings that he had an emergency and lost track of the time. He provided no supporting evidence as to the emergency. After the August 24 hearing, Mr. Schollian proceeded to draft a Sale Order consistent with what transpired on the record. However, adding salt to the Debtors' wounds, when he presented the Order to the Court, he added $500 in attorneys' fees to be paid by the Debtors as an administrative expense in the case for drafting the Sale Order. The Court struck the fees from the Order and entered the Sale Order electronically on the docket. Eventually the Debtors were able to close on the sale of the residence and enter into a leaseback arrangement so that they did not need to vacate the premises immediately.[31]

At the September 6, 2005 Order to Show Cause hearing, no one from the Firm appeared. The Debtors were also not present at the hearing. This Court attempted to contact an attorney at the firm, by telephone, while in the Courtroom. Incredibly the Courtroom deputy was transferred from voice mail to voice mail, disconnected a number of times, and was ultimately, after at least six attempts, unable to have any attorney at the Firm pick up the telephone. The

---

issue ever to be addressed if it is not discussed? Moreover, in this case, since the Debtors were provided with no explanation as to the transfer of the file back to Mr. Schollian, it only made the Debtors more resentful of the treatment that they were receiving.

**31.** At one of the Order to Show Cause hearings, Mr Schollian discussed the legal problems in the Debtors' case and why he felt that he had adequately represented them. During the course of the hearing, it became clear that he was not aware of the Debtors' current address or even when they had moved. There was a lack of communication between Mr. Schollian and the Debtors.

9

Court continued the Order to Show Cause hearing. At the subsequent hearings, the Court was advised that since the Minute Entry Order had been sent to only two attorneys at the Firm, one of whom, Ms. Froes, was no longer the attorney handling the matter, the Firm did not feel that the Order to Show Cause had been properly sent to it. Of course, this leads to the question that if the Court is not advised as to the transfer of files, why is the issuance of the Order to Show Cause improper if the Court sends the Minute Entry Order to the Firm, listing the only attorneys that the Court is aware of that are connected with the matter? In essence, it was the responsibility of the Firm, and the attorneys who practiced at the Firm, to make sure that they had procedures in place so that they could comply with the Local Bankruptcy Rule which mandates that the Firm provide the Court with the attorney at the Firm with whom the Court may readily communicate in a particular matter.[32]

---

**32.** Local Bankruptcy Rule 9010-1 provides in part:

(a) Attorney of Record. An attorney who has appeared on behalf of a party in a case or proceeding becomes the attorney of record for the party in that case or proceeding. An attorney of record shall remain such until the time for appeal of any judgment has expired or any such judgment has become final, the case has been closed or dismissed, or the court has entered a formal order of withdrawal or substitution in the case.

(b) Withdrawal and Substitution. No attorney shall seek withdrawal or substitution as attorney of record in any pending case or proceeding except by written application. Unless the Rules require otherwise, the application shall contain at a minimum: (1) the name, address and telephone number of the substituting attorney, and such attorney's approval; or (2) if no substituting attorney exists, the client's name, last known address and telephone number, and a certificate of the attorney that the client has been notified in writing of the status of the case, including the dates and time of any court hearings or trial settings and the need to comply with any existing court orders, discovery requests and the possibility of sanctions for the failure to comply. The application shall be presented to the court, may be considered without a hearing, and shall be accompanied by a proposed order containing the name, address and telephone number of the person to whom subsequent pleadings shall be sent.

(c) Notice. Prompt notice of any withdrawal or substitution order shall be given to all interested parties in any case, adversary proceeding, or contested matter in which the withdrawing attorney has appeared.

10

Although Mr. Raskin did testify at one of the hearings on the Order to Show Cause, he was not specific as to the problems that he encountered with the Firm other than to note that he had some problems getting an attorney at the Firm to draft a Sale Order once the property was sold at the August 24 hearing. Mr. Raskin did state that he believed that the Debtors' residence was going to be sold at a trustee's sale at the end of August; therefore, he felt that he had to obtain an offer for the Debtors' residence prior to the August 24 hearing, even if the offer was lower than what had been obtained previously. He noted that the residence was sold for $320,000. Mr. Raskin, however, was unable to testify that he could sell the property for substantially more if he had been given more time. He also did not present any kind of detailed market analysis which would have assisted the Court in determining whether the Debtors' residence was sold for an inappropriately low amount so that one or more individuals at the Firm should be sanctioned. He noted that the contract for $370,000 "had fallen through," so he was unsure to what extent the Debtors' residence had a greater value than what was obtained. Mr. Raskin was surprised to learn, after the August 24 hearing as a result of the issuance of the Order to Show Cause, that there was no scheduled trustee's sale of the Debtors' residence. He testified that after the August 16 hearing, he attempted to learn from the secured lender, the Firm, and from other parties as to when a trustee's sale was scheduled. He was unable to get any information, so he proceeded with the information that he had obtained from the Debtors, which was that Ms. Froes had previously advised the Debtors that a trustee's sale would occur at the end of August. It appears that no one at the Firm bothered to obtain information as to the date and time of the trustee's sale.[33]

---

**33.** The Court recognizes that the Fee Agreement placed the responsibility on the Debtors to keep track of the trustee's sale continuances if the trustee's sale was pending at the time that the Debtors filed their case. However, in this matter, it was Debtors' counsel, Ms. Froes, who had initially advised the Debtors that a trustee's sale was scheduled. The Debtors were not aware of any such sale. Having advised the Debtors that a sale was imminent, it occurs to this

11

At the Order to Show Cause hearing, it became clear that Mr. Turner was still angry at what had transpired and blamed the Firm for the expedited sale of the residence. The Debtors did advise the Court that the funds paid by them for attorneys' fees and costs in the matter had been returned to them. Thus, a portion of the Order to Show Cause relief became moot by the end of the hearing. The Firm was no longer requesting any compensation from the Debtors and had returned all of the moneys paid by the Debtors, except the Court filing fee. Thus, the Court must still consider to what extent it should refer this matter to the State Bar of Arizona for a violation of the numerous ethical rules set forth in the Order Reinstating the Case dated November 9, 2005.[34] There is also the issue whether this Court should award the Debtors any type of damages as a result of the expedited sale of their residence as some type of sanction against the Firm.

**B. The Shaw Case**

On November 15, 2005, the Debtor sent a handwritten letter to the Court, complaining that he was not represented by the Firm at his 341 meeting of creditors in his Chapter 7 case.[35] The Debtor attached his Fee Agreement to his letter. The Debtor agreed to pay a flat fee of $791 to the firm for the services to be rendered, and the filing fee, and the documents attached to the Fee Agreement acknowledge receipt of both payments.[36] The Fee Agreement states that one of the services to be rendered by the Firm is the representation of the Debtor at the 341 meeting of

---

Court that the Firm should have taken the next step and obtained appropriate accurate information to be relayed to the Debtors. This was never done by the Firm.

**34.** Docket Entry No. 54.

**35.** Docket Entry No. 14.

**36.** Id. at "Disclosure of Compensation" and "Regulation Z" documents attached to the Debtor's letter.

12

creditors.[37] The Debtor states, in his letter, that when he arrived for his 341 meeting, no one from the Firm was present, "half the room" was also left without adequate representation because of the Firm's failure to appear, the Trustee expressed her concerns about the Firm's failure to appear on the record, and the Debtor felt "cheated" by the Firm and wanted at least a partial refund.

Based upon this letter, the Court issued an Order to Show Cause to the Firm. Two supervising attorneys at the Firm appeared at the hearing, but the Debtor did not. Counsel stated that they refunded the Debtor the sum of $200 for the inability to be present at the 341 meeting of creditors.[38] The attorneys stated that the attorney who was to appear at the 341 meeting of creditors and represent the Debtor was before another trustee, noting that because of the tremendous number of cases filed just before October 17, 2005, the effective date for extensive changes to the Bankruptcy Code, the trustees in Arizona were conducting simultaneous 341 meetings of creditors in an effort to keep up with the caseload. The Firm had anticipated that the Debtor would simply wait until the attorney arrived. Instead the Debtor chose to proceed at the 341 meeting of creditors without the assistance of counsel. The Court requested that the attorney that was actually to be at the 341 meeting of creditors for the Debtor submit a separate affidavit to the Court.

On December 14, 2005, the Affidavit was submitted by the attorney.[39] The Affidavit refers this Court to the audio transcript of the proceedings before the Trustee assigned to the Debtor's case and the trustee before whom the attorney was appearing at the same time. The attorney's Affidavit avows that he was before the trustee from 10:07 to 10:30 a.m., and that the Debtor chose to be examined by his Trustee, without the assistance of counsel, at 10:14 to 10:17 a.m. The attorney also notes that at the commencement of the calendar, the Debtor's Trustee

---

**37.** Id. at Fee Agreement, p .1,¶ Numbered1, "Scope of Services," Para. c thereunder.

**38.** Docket Entry No. 21, which is the Minute Entry from December 12, 2005.

**39.** Docket Entry No. 23.

13

advised everyone present in the room that counsel for one or more individuals might be present in the other hearing room. The attorney states that the Debtor was the only Firm's client in the hearing room for that one-half hour time slot. The attorney states that the Trustee advised the Debtor that he could proceed without counsel and then file a motion to disgorge attorney's fees. The attorney states that other trustees had accommodated him by moving clients to the end of the calendar, and he felt that the Trustee in the Debtor's case had not extended him common courtesy. The attorney also states that the Spanish translator from the Firm was present and did advise the Trustee that the attorney for the Debtor was in another hearing room and that, perhaps, the Debtor's case could be called at the end of the calendar.[40] The Trustee chose to call the case at the set time and made the comments that the Debtor could proceed without counsel.

On December 14, 2005, the supervising attorney of the bankruptcy division at the Firm also submitted an affidavit. He described the procedures of the division, including the client conference and the advice given to the debtor that attendance at the 341 meeting of creditors is mandatory. He stated that the firm has filed over seven thousand Chapter 7 and 13 cases and that "very few" meetings of creditors are missed by the Firm. It is unclear over what period of time the seven thousand cases were filed, or how many meetings of creditors were missed. He did state that if the Firm misses a meeting of creditors, the debtor is issued a $200 refund. He also noted that because of the record number of filings prior to the enactment of Bankruptcy Abuse Prevention Consumer Protection Act of 2005, the Firm "currently employs a total of eleven full time bankruptcy attorneys." The attorney also noted that the Debtor had appeared at the initial meeting of creditors with an attorney from the Firm; however, because the Debtor appeared with original documents in support of his case and petition, the Trustee continued the meeting of creditors. It was at the continued meeting of creditors that the Debtor appeared and decided to proceed even though the attorney had not yet arrived.

---

**40.** This is consistent with the Debtor's letter. The Debtor also refers to someone from the Firm being present when the Trustee made comments about the Firm's inability to be present to represent its client, but the Debtor is unclear as to who that other individual was.

14

Since several attorneys at the Firm supported the Firm's position with affidavits and the Debtor did not appear at the Order to Show Cause hearing, the Court will proceed with a decision in this matter without a further hearing or evidence.

### III. Issue

Because the Firm refunded in whole, or in part, the attorney's fees that they received in these cases, and because the Debtor, in the Shaw case, chose not to attend the Order to Show Cause hearing to request a full refund, the Court concludes that any issues arising under 11 U.S.C. §§327, 329, and 330 have been resolved, and the Debtors seek no further relief from the Court.[41]

The next issue for consideration is whether this Court should refer these matters to the Arizona State Bar for further proceedings as to possible violations of one or more of the ethical rules as set forth in Rule 42 of the Arizona Rules of the Supreme Court. The Order to Show Cause issued in the Turner case advised the Firm of the ethical rules that the Court might be considering in its analysis.[42] The Court did not proceed with a more detailed Order to Show Cause as to the Firm in the Shaw case, since the Debtor did not appear at the hearing and the Firm presented affidavits in support of their position.

### IV. Discussion

What is clear from the evidence is that the Firm handles a tremendous volume of consumer bankruptcy cases, both Chapter 13 and Chapter 7 cases. Chapter 13 cases require

---

**41.** Because the Turners filed a Chapter 13 proceeding which provided for the payment of the portion of the Firm's fees through the plan of reorganization, Sections 327 and 330 of the Bankruptcy Code are also implicated.

**42.** *See* Order dated November 9, 2005, in the Turner case, Docket Entry No.54.

15

more time and expertise from an attorney, because the debtors are proposing to repay the creditors over a period of time in a plan of reorganization. Any such plan requires a thorough understanding of the debtor's assets (both exempt and non-exempt) and debt structure, what income is available to repay creditors, whether in the nature of wages received from an employer or from a business that the debtor operates as a sole proprietorship, what the debtor's expenses are on a monthly basis, and whether any liens are subject to avoidance. A Chapter 7 proceeding allows the debtor to retain exempt assets, but the non-exempt assets are generally turned over to the trustee for a prompt liquidation, so that the creditors of the bankruptcy estate may receive a distribution on their claims. The Firm, however, is unable to provide one attorney from the initial interview with a debtor to the successful resolution of the case. Particularly in the Turner case, which required more time and effort because it was a Chapter 13 case and which required an analysis of the consensual liens on the Debtor's residence and to what extent the Debtors were in jeopardy of immediately losing their home at a trustee's sale under Arizona law, the Firm should have had one attorney who consistently communicated with the Debtors about the status of the case and how the Debtors should proceed. Even in the Shaw case, the Firm acknowledged that they had one attorney represent the Debtor at the initial meeting of creditors, but another attorney was designated to represent the Debtor at the continued meeting of creditors. In essence, it appears that the Firm utilizes so many attorneys on any given case, that the debtor is left with a lack of information, confusion, and, as in the Turner case, strong feelings of resentment and anger.

    E.R. 1.4 Communication states

(a) A lawyer shall:
. . . .
(2) reasonably consult with the client about the means by which the client's objectives are to be accomplished;
(3) keep the client reasonably informed about the status of the matter;
(4) promptly comply with reasonable requests for information . . .
(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation. . . .

16

This Court is of the opinion that in these two cases, the Firm did not meet the professional standard necessary to comply fully with ER 1.4 (a)(2), (3), and (4), and ER 1.4 (b). However, the Firm has recognized some deficiencies in how these cases were handled. The Firm has attempted to assuage both clients by returning all or a portion of the fee that they paid. This Court believes that the Firm could use further assistance, through a professionalism course or otherwise, in assigning, reviewing and analyzing cases in an appropriate manner so that one supervising and one associate attorney provide appropriate, timely communication and advice to the client, to provide a debtor with competent legal representation in a bankruptcy case from the filing of the petition through the closing of the case.

The Turners have also requested additional damages for "lost profits" concerning the sale of their residence. The Court concludes, at least on this record, that the Debtors failed to provide sufficient evidence that the Firm was the proximate cause for the lower price of their residence and, hence, should be held accountable for some type of sanction amount. The Ninth Circuit does recognize the inherent ability of the bankruptcy court to sanction an attorney. In re Hercules Enterprises, Inc., 387 F.3d 1024 (9th Cir. 2004); In re Rainbow Magazine, Inc., 77 F.3d 278 (9th Cir. 1996); In re Lehtinen, 332 B.R. 404 (9th Cir. BAP 2005); In re Deville, 280 B.R. 483 (9th Cir.BAP 2002). However, in this case, the Turners chose to sell their residence because they could no longer afford to make their mortgage payments. After presumably appropriate marketing by Mr. Raskin, the initial contract on their residence was rescinded or cancelled by the buyer. The Firm was not responsible for the cancellation of this contact. Although Mr. Raskin was only able to obtain a subsequent contract for the residence in an amount that was $50,000 less than the prior contact, such a lower amount does not shock the conscience of the Court and, at least as to the evidence presented, appears to have been caused by other factors, such as the real estate market in the Debtor's residential area. The Court is not in a position to quantify what, if any, damages were incurred by the Debtors in the sale of their residence and to conclude that the Firm was the proximate cause of any speculative loss. Hence, the Court must deny the

17

request of the Turners for additional damages.

## V. Conclusion

Based upon the foregoing, the Court concludes that part of the relief requested is moot. The Firm refunded in whole, or in part, the attorney's fees they received in these cases. If this information is inaccurate, the Firm needs to notify the Court immediately. The Turners additional claim for "lost profits" is denied. The Debtors failed to provide sufficient evidence that the Firm was the proximate cause for the lower price of their residence and, hence, should be held accountable for some type of sanction amount. However, the Court will refer this matter to the Arizona State Bar for the purpose that the Firm be required to take some form of professionalism course as outlined above.

DATED this 31st day of March, 2006.

_/s/ Sarah Sharer Curley_
Honorable Sarah Sharer Curley
U. S. Bankruptcy Judge